F I L E D
United States Court of Appeals
Tenth Circuit

MAY 25 2001

PATRICK FISHER
Clerk

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

PEGGY S. LANGILLE and MARGY
LARSON,

        Plaintiffs - Appellants,

        v.

LOGAN CITY, a political subdivision
of the State of Utah; RICH
HENDRICKS, Logan Chief of Police;
MARCENE PARKER, individually
and in her capacity as head of Logan
City Dispatch Center; and DARLA
CLARK, individually and in her
capacity as Mayor of the City of
Logan,

        Defendants - Appellees.

No. 99-4222

(D. Utah)

(D.C. No. 97-CV-69-S)

---

**ORDER AND JUDGMENT**[*]

---

Before **TACHA**, Chief Judge, and **ANDERSON** and **MURPHY**, Circuit Judges.

---

[*]This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Plaintiffs Peggy Langille and Margy Larson appeal from the grant of summary judgment to defendants, Logan City, Logan City Police Chief Richard Hendricks, former Logan City Mayor Darla Clark, and Marcene Parker. Plaintiffs had brought a variety of claims against defendants, all arising out of the closure of the emergency dispatch center at which they worked and the failure by Logan City to hire plaintiffs to work at its new dispatch center. We affirm.

**BACKGROUND**

Beginning in 1991, Cache Valley Communications Center ("CVCC") provided dispatch and emergency services for all of Cache County, Utah. Cache County managed the CVCC under a management contract which was due to expire in August 1996. CVCC employees were employees of Cache County, although the CVCC was a separate entity from other Cache County governmental agencies and was governed by an Operations Board and a Governing Board. The Operations Board included the following individuals: defendant Logan City Police Chief Rich Hendricks, the Cache County Sheriff, the Logan City Fire Chief, and the Cache County Lieutenant of the Utah Highway Patrol. CVCC's Governing Board included the following individuals: Cache County Executive Lynn Lemon, the Mayor of Logan City, a Logan City council member, and a representative from the Utah Department of Public Safety.

Plaintiffs Langille and Larson were Cache County employees who worked at the CVCC. Ms. Langille was the CVCC Director, and she reported to and attended meetings of the Operations and Governing Boards. Ms. Larson was a dispatcher, under Ms. Langille's supervision.

In June 1995, Ms. Larson and her husband William, who was a Cache County Deputy Sheriff, filed a complaint in federal district court against Cache County, Lynn Lemon, and others. In July 1996, Ms. Langille was deposed in connection with the Larson lawsuit. At the deposition, she was questioned about a sexual harassment complaint made by a fellow Cache County employee against Ms. Larson. Specifically, she testified as follows:

Q: Have you discussed this case with Lynn Lemon?
        . . . .
A: The lawsuit has been brought up between Lynn Lemon and I, yes.
Q: [by Ms. Langille's attorney]: When was the first time you recall the lawsuit being brought up?
A: I don't know if this was the first time, but the time I recall that the lawsuit was brought up between him and I was in a meeting the end of June.
Q: Of 19–
A: '94 – or '5, excuse me.
Q: Do you recall where the meeting took place?
A: In Lynn Lemon's office.
Q: Do you recall why you were in Lynn Lemon's office?
A: We were discussing another matter.
Q: What were you discussing?
A: We were discussing a complaint.
Q: Did the complaint involve either of the Larsons?
A: Yes, it did.
Q: What was the complaint?

A: Under instructions that the complainant was to remain confidential, I don't feel that I can disclose any more information about that complaint at this time.

Q: Is this the complaint concerning [Jane Doe]?

A: I – I've been told that it's confidential.

Q: Who told you that it was confidential?

A: Lynn Lemon told me that it was confidential.

Q: What's your understanding of confidential information?

A: That if my county executive tells me the information is confidential, I am not allowed to talk about that information to anyone.

Langille Dep. at 23-24, Sealed Addendum to App. at 507. There followed an off-the-record discussion between Cache County's and Mr. Lemon's counsel and counsel for Ms. Langille, followed by this further testimony:

Mr. Lambert [Cache County counsel]: You've already identified the complainant; she asked that the information be kept confidential. I don't see a legal reason why it can't be asked about in the deposition, but out of respect for her, we should try to – we ought to keep the information about her complaint as limited in circulation as possible.

Ms. Falk [counsel for Ms. Langille]: Out of respect for Ms. Langille?

Mr. Lambert: No –

Ms. Falk: The complainant?

Mr. Lambert: The complainant who gave the confidence and asked that it be given in confidence.

(There was a witness-attorney discussion)

The witness: So on the record for my sake, then if I break confidentiality as imposed by my county executive, are they saying that I will –

Mr. Lambert: My instruction –

The witness: – not be held accountable?

Mr. Lambert: My instruction as attorney in this case, I will instruct you that you may answer that question.

[There was a discussion off the record between Mr. Lemon and Mr. Lambert]

Q: What was the complaint about?

- 4 -

The witness: I'm allowed to talk about this?
Mr. Lambert: Yes. You can answer the question.
The witness: Okay.
The complaint was about – was an accusation that the complainant had that Margy had said something offensive.
Q: What had Margy allegedly said?
A: Allegedly the complainant came into the dispatch center and started speaking with Margy – I can't recall the exact circumstances – but something was said about how hot it was or something about the weather, and allegedly Margy said that it – that it – that she wasn't wearing any underwear.
          That was supposed –
Q: That the complainant wasn't wearing any?
A: No, that Margy wasn't.

Langille Dep. at 25-26, Sealed Addendum at 507.[1] Plaintiffs allege that Mr. Lemon, who was present during the deposition, became "visibly upset" when Ms. Langille gave the above testimony. Mr. Lemon testified that he was upset because he felt Ms. Langille had breached the sexual harassment complainant's request for confidentiality and had thereby violated county policy.

In August 1996, a few days before the management agreement between Cache County and the CVCC expired, the Governing Board of the CVCC voted to renew the agreement. Among those Governing Board members voting to renew the agreement was defendant Darla Clark, then the mayor of Logan City. Cache

---

[1]Defendants allege that they first saw a transcript of the Langille deposition in the Larson case when the pages cited were attached to their memorandum in opposition to defendants' summary judgment motion, which was filed after the discovery cutoff deadline. Defendants therefore objected below and on appeal to plaintiffs' citation of those pages.

County, however, decided not to renew the agreement. Mr. Lemon testified that he was concerned that Cache County was providing management and staff services to CVCC without reimbursement, that Cache County had no authority over CVCC employees even though they were in fact county employees, and that Cache County could incur liability on behalf of the CVCC without being indemnified by it. Cache County offered to renegotiate the agreement if the CVCC Governing Board so requested, which it never did.

A joint Governing/Operations Board meeting was held on August 20, 1996, to discuss Cache County's decision not to renew the agreement. Ms. Langille attended the meeting, and she testified that board members discussed Cache County's concerns about costs and insurance liability. The Governing Board asked the Operations Board to analyze options for keeping the CVCC open and make recommendations. Ms. Langille participated in the Operations Board's analysis of various options, of which there were several.

In October 1996, Chief Hendricks proposed to the Operations Board that Logan City operate its own dispatch center to serve all of Cache County, thereby essentially taking over the operations of the CVCC. The CVCC Operations and Governing Boards voted unanimously in favor of this proposal. Ms. Langille apparently expressed no opposition to this proposal at any Board meetings. Ms. Larson expressed some concerns about it.

Both Ms. Langille and Ms. Larson testified they understood that Logan City would not automatically hire for its dispatch center all former CVCC employees, and that Logan City would operate the center in accordance with its own rules and guidelines, including its anti-nepotism policy. Ms. Langille testified "that this was not a grandfathering or absorbing kind of move. It was totally you are hiring or applying for a brand new position." Langille Dep. at 42, Appellants' App. at 118.

In the fall of 1996, Logan City delivered employment applications to CVCC employees. Logan City Human Resources Director Diane Astle determined the qualifications for available jobs. All applicants were required to take a typing test. Both Ms. Langille and Ms. Larson applied for jobs, as did CVCC dispatcher and defendant Marcene Parker. Ms. Larson failed her first typing test but passed the second one.

Chief Hendricks had the ultimate hiring authority for the new Logan City dispatch center, but he delegated that authority to a hiring committee consisting of the following individuals: Utah State University dispatch coordinator Judy Crockett, Logan police sergeant Richard Salvesen, Logan police lieutenant Randy Auman, and Logan City human resources assistant Bruce Adams. The hiring committee interviewed each applicant.

The committee members testified that, following their interviews with Ms. Langille and Ms. Larson, each committee member had concerns about their qualifications and suitability for the positions they sought. The committee accordingly recommended to Chief Hendricks that neither plaintiff receive a job offer. Chief Hendricks followed the committee's recommendation. Logan City therefore hired defendant Parker for the dispatch coordinator position Ms. Langille had sought and Sherri Aller, Ms. Larson's stepdaughter and a former CVCC dispatcher, for one of the new dispatch positions. In addition to Ms. Langille and Ms. Larson, one or two other CVCC dispatchers were not hired by Logan City.[2]

Plaintiffs filed this action, arguing multiple causes of actions, including 42 U.S.C. § 1983 claims for unlawful search and seizure and violations of their free speech, freedom of association and equal protection rights; tortious interference with prospective economic relations; malicious prosecution; defamation; intentional infliction of emotional distress; 42 U.S.C. §§ 1985 and 1986 claims of conspiracy; and common law conspiracy.[3] Plaintiffs' basic argument was that

_____

[2]Ms. Langille testified that CVCC dispatcher Lana Neville had also not been hired by Logan City. Langille Dep. at 61, Appellants' App. at 122. Randy Auman testified that Bonnie Helquist also was not hired. Auman Dep. at 123, Appellants' App. at 293.

[3]Ms. Langille also initially sued Cache County and certain of its employees. Ms. Langille subsequently stipulated to the dismissal of those claims. Thus, only

(continued...)

- 8 -

defendants conspired with Cache County to close the CVCC and transfer its operations to Logan City and then refused to hire plaintiffs for the new Logan City dispatch center, all as retaliation for Ms. Larson's lawsuit against Cache County, for Ms. Langille's testimony in that action, and for their close friendship.

Plaintiffs subsequently dismissed their claims for defamation and tortious interference with employers other than Logan City, and certain other claims were dropped. Defendants then moved for summary judgment on all remaining claims, which the district court granted.

Plaintiffs appeal only the following claims: Ms. Langille's free speech claim against Logan City; plaintiffs' freedom of association, equal protection, federal conspiracy and common law conspiracy claims against Logan City; and plaintiffs' tortious interference claims against Chief Hendricks, Ms. Parker, and Ms. Clark.

## DISCUSSION

We review de novo the district court's grant of summary judgment. Phelan v. Bd. of Trustees, 235 F.3d 1243, 1246 (10th Cir. 2000), cert. denied, 2001 WL

---

[3](...continued)
the Logan City defendants remain.

267500 (U.S. May 14, 2001).  Additionally, "[w]hen First Amendment issues are raised, our review is also de novo."  Id.

All of plaintiffs' claims stem from the failure of Logan City to hire them for its new dispatch center, following the closure of the CVCC.  As explained more fully below, each claim either depends on the existence of evidence of a conspiracy between Cache County and certain of its employees and the Logan City defendants or requires a demonstration of independent wrongdoing by the Logan City defendants.  Because we conclude that plaintiffs fail to present any actual evidence of a conspiracy or any other wrongful conduct by defendants, summary judgment to defendants on all of plaintiffs' claims is proper.

## I.  Section 1983 Claims

Plaintiffs raise two § 1983 claims:  first, that Ms. Langille's right to free speech was impaired when Logan City failed to hire her in retaliation for her testimony in the Larson case; and second, that both Ms. Langille's and Ms. Larson's freedom of association rights were impaired because Logan City restrained Ms. Langille's right to support Ms. Larson in the Larson case.

With respect to her free speech claim, Ms. Langille alleges that "Logan City violated [her] right to freedom of speech by retaliating against her for testifying truthfully, under oath, regarding the improper actions of County

Executive, Lynn Lemon." Appellants' Br. at 17. Ms. Langille alleges that "[s]pecifically, Ms. Langille testified that Mr. Lemon instructed her to enter an alleged sexual harassment complaint into Ms. Larson's personnel file while the lawsuit was pending, without explaining the reasons for disciplinary action and without investigating the veracity of the complaint." Id.

"[T]ruthful testimony is protected by the First Amendment and . . . a government employee may not be fired or subjected to other adverse action as a result of such testimony." Worrell v. Henry, 219 F.3d 1197, 1204-05 (10th Cir. 2000), pet'n for cert. filed, ____ U.S.L.W. ____ (U.S. April 10, 2001) (No. 00-1593). However, "First Amendment protection of public employees' testimony is not absolute." Id. at 1205. "There are instances in which government entities' interests as employers outweigh employees' interests in free expression and the  policy of encouraging truthful and uninhibited testimony." Id. To weigh these interests, courts employ the balancing test set out in Pickering v. Bd. of Educ., 391 U.S. 563 (1968) which balances the public employee's interest in commenting upon matters of public concern" against the government's interest in "promoting the efficiency of the public services it performs through its employees." Id. at 568.

The Pickering balancing test involves a four-part inquiry, the first of which is "whether the speech in question addressed a matter of public concern."

Worrell, 219 F.3d at 1205.  If the speech in question does not address a matter of public concern, the inquiry proceeds no further.  "Speech that pertains to a public agency's 'discharging its governmental responsibilities' ordinarily will be regarded as speech on a matter of public concern."  David v. City and County of Denver, 101 F.3d 1344, 1355 (10th Cir. 1996).  By contrast, "speech relating to internal personnel disputes and working conditions ordinarily will not be viewed as addressing matters of public concern."  Id.

Even assuming that her actual deposition testimony in the Larson case could be viewed as alleging some kind of wrongdoing by Mr. Lemon, and therefore speech on a matter of public concern,[4] any such wrongdoing is attributable, if at all, to Cache County, the entity for whom Mr. Lemon worked.  Cache County is obviously a separate entity from Logan City.   Defendants in this case are Logan City and some of its employees.  Further, with respect to any claim of impropriety in the decision to close the CVCC, it was Cache County, not

---

[4]The excerpt from Ms. Langille's deposition testimony contained in the record in this case, and quoted in full above, only reveals Ms. Langille's attorney's disclosure of the name of the employee who made a sexual harassment complaint against Ms. Larson, and Ms. Langille's apparent discomfort at testifying on a matter about which Mr. Lemon had requested confidentiality.  That excerpt contains no testimony by Ms. Langille concerning any request by Mr. Lemon that Ms. Langille improperly place something in Ms. Larson's personnel file.  Ms. Langille's testimony suggesting that Mr. Lemon directed her to improperly place something in Ms. Larson's personnel file appears in a deposition in *this* case.  But Ms. Langille does not, nor could she, base her free speech claim on alleged retaliation for testimony in this case.

Logan City, which decided not to renew the CVCC agreement. Similarly, with respect to Ms. Langille's claim of retaliation for her testimony in the <u>Larson</u> suit, she alleges retaliation because Mr. Lemon, a Cache County employee, was angered by her testimony.

Thus, plaintiffs' allegations of wrongdoing and retaliatory animus in connection with the closure of the CVCC and plaintiffs' involvement in the <u>Larson</u> case are all directed at Cache County employees and their conduct. But, absent a conspiracy between the two groups, Cache County employees had nothing to do with who Logan City hired for its new dispatch center. Despite plaintiffs' allegations of a conspiracy, the record reveals nothing more than conclusory allegations, conjecture and pure speculation in support of their conspiracy claims. We therefore affirm the district court's grant of summary judgment to defendants on Ms. Langille's free speech claim.[5]

Plaintiffs' freedom of association claim fails for the same reason. Plaintiffs allege that they "have a constitutional right to associate with one another and Logan City impermissibly restrained Ms. Langille's right to support Ms. Larson's claims in the <u>Larson v. Cache County</u> case." Appellants' Br. at 30.

---

[5]Defendants argue that Ms. Langille's free speech claim is also properly dismissed because she was not an employee of Logan City. However, "[t]his circuit has applied the <u>Pickering</u> balancing to hiring decisions." <u>Worrell</u>, 219 F.3d at 1207 (noting that other circuits have done the same).

- 13 -

Even assuming this argument was raised below,[6] we affirm the district court's grant of summary judgment to defendants on this claim. As defendants point out, plaintiffs have admitted that Logan City had nothing to do with the Larson lawsuit against Cache County. Furthermore, there is no evidence at all that defendants (Logan City and some of its employees) in any way restricted Ms. Langille's ability to testify in the Larson lawsuit. Absent evidence of a conspiracy between Logan City and Cache County, plaintiffs' freedom of association claims must fail.

## II. Equal Protection Claim

Plaintiffs argue that defendants violated their rights under the equal protection clause of the constitution "by abridging Ms. Langille's fundamental right to freedom of speech and their fundamental right to associate with one another." Appellants' Br. at 40. To the extent plaintiffs' equal protection claim

---

[6]Defendants argue that plaintiffs have characterized their freedom of association claim on appeal very differently from the way they did below. Below, the plaintiffs argued that there was a factual question as to whether the relationship between them was sufficiently personal as to be "intimate" for freedom of association purposes and that "defendants have plainly denied plaintiffs of their right to associate by abridging their rights of free speech. . . . [D]efendants cannot intimidate and coerce plaintiffs into silence in retaliation for speech regarding matters of public concern, namely, discrimination based on sex or sexual harassment of public employees." Pls' Mem. of P. & A. in Opp'n to Defendants' Mot. for Summ. J. at 40, Sealed Addendum to Appellants' App. at 388. On appeal, they focus on Ms. Langille's right to associate with and support Ms. Larson in her lawsuit.

is premised on their claimed violations of Ms. Langille's free speech rights and both plaintiffs' freedom of association rights, their equal protection claim founders with our affirmance of summary judgment to defendants on the free speech and association claims.

They also appear to argue that they were "similarly situated" to other CVCC employees, and that defendants' failure to hire them for the new Logan City dispatch center constituted unequal treatment of similarly situated employees. We reject this claim. "'[A] violation of equal protection occurs when the government treats someone differently than another who is similarly situated.'" Crider v. Bd. of County Comm'rs., 2001 WL 392411 at *__ (10th Cir., April 18, 2001) (quoting Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence, 927 F.2d 1111, 1118 (10th Cir. 1991)). Thus, to state a valid equal protection claim, plaintiffs must demonstrate that they were similarly situated to other CVCC employees who were hired. Other than alleging that they were all CVCC employees, plaintiffs completely fail to demonstrate that they were similarly situated in any meaningful or relevant way to those CVCC employees who were hired by Logan City. Indeed, they were all similarly treated in being subjected to the identical interviewing and hiring process. Logan City simply chose to hire some, but not all, of those who applied. The district court properly granted summary judgment to defendants on this claim.

**III. Conspiracy Claims**

We have already held that plaintiffs have failed to present sufficient evidence of a conspiracy between Cache County and Logan City to withstand defendants' motion for summary judgment on these claims.

**IV. Tortious Interference Claim**

Plaintiffs' final claim is one for "tortious interference with prospective economic relations because Defendants/Appellees Rich Hendricks, Marcene Parker and Darla Clark intentionally interfered with their employment." Appellants' Br. at 43. A tortious interference with prospective economic relations claim requires proof of the following: "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff." St. Benedict's Dev. Co. v. St. Benedict's Hosp, 811 P.2d 194, 200 (Utah 1991) (citing Leigh Furniture and Carpet Co. v. Isom, 657 P.2d 293, 304 (Utah 1982)). We have carefully reviewed the record in this case and affirm the district court's conclusion that there is no evidence establishing "a triable issue that plaintiffs had an existing or potential business economic relationship for purposes of their tortious interference claim or that defendants interfered with any such

relationship." Mem. Decision at 14, Appellants' App. at 341. Further, there is no evidence that defendants acted with an improper motive or by improper means.

## CONCLUSION

For the foregoing reasons, we AFFIRM the grant of summary judgment to defendants on all of plaintiffs' claims.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge